Our fourth case for this morning is Louise Milan v. Bolin. Mr. Burkhardt. Thank you, Your Honor. Robert Burkhardt on behalf of the appellants, the individual police officers for the Evansville Police Department. This case comes before the court on the district court's denial of summary judgment on the issue of qualified immunity for the officers' use of flashbang grenades in the execution of a search warrant. There's no dispute that there was a valid search warrant, but the district court found questions as to whether the officers used excessive force in using those flashbang devices in executing the search warrant at Ms. Milan's residence. The officers first contend that the... I find it bizarre that the police did not compensate the Milan for the damage to her house. Your Honor, the evidence is undisputed in the record that they paid for all the damage to the residence. They did? The broken windows, yes. Oh, all right, I missed it. I didn't think... Yes. But what I find bizarre, and I guess putting it a little more technically, one reason I suspect Judge Lawrence thought that there were disputed issues of fact on the question whether this was excessive force, is on the one hand, of course, you have your client's account of these threatening emails and so on, and one should take such things quite seriously. But on the other hand, you have everything from the fact that they invited TV crew to come along with them, if it was really all that dangerous, I can't believe the police would knowingly put civilians in the path of danger, and they already have focused on Murray as the likely source of these, they don't think it's Milan, it's a search for internet devices, and they know there's an open spot very near her house. They've driven up and down the street and they've found an unsecured internet. So I can see the one hand, the other hand, and it seems to me whether the force was excessive is going to depend on further factual resolution, and we can't just say, well, subjectively, they were all freaked out about these emails. In fact, they don't even seem that way, looking at the videos, the helmet video, they seem, you know, they're on a mission to do something, but they've decided to use the flashbangs before they're anywhere near the house. And they don't use them for Murray. Well, several points there. First of all, Your Honor, the presence of the news media, which was down the street. Not that far down the street. If you look at their video, they're 15 feet away, 20 feet away, maybe, at the most. And I, as I say, if you really thought that you were after some hardened killer, I just can't believe you would put the news media, maybe you would. But it seems to me a jury could think that that was a signal that it was not a situation that needed this level of force. And courts have recognized that if you allow news media to come in and enter the home, it can satisfy the use of excessive force. But in this case, they were not. Well, and I'm just saying, couldn't a jury here see this as one piece of evidence that suggests that the force used here was excessive? No, because I think for several matters. First, if you look at the threats themselves, the threats were brought to the attention by the FBI, the media, and local citizens. They specifically referenced threats to mass murder, effectively. I understand that. What kind of protective gear do these SWAT people have? What are they wearing? Well, the video will show what they're wearing, but they have helmets. Some of them have armored vests. They've all carried weapons, obviously. Pretty formidable crew, right? Absolutely. Are they frequently shot when they make these SWAT sweeps of people's houses? There's no evidence in the record as to prior incidents. Well, wouldn't that be relevant, whether they're in actual danger? No, because the courts look at the totality of the facts known to the officers at the time of the incident. Oh, try. Don't give me the totality of facts. I'm asking about what is the record with respect to the actual risks taken by these SWAT people, which would warrant the use of these flashbang devices? Well, in this particular case, there's the threat that the individual who made the online threat said that he had a desire to kill police officers. But they don't think that individual is in this house. They think that individual is Murray, who lives two doors down. And then they find three other people, one of whom four and a half years ago was associated with the house, one of whom was never associated with the house, and a third of whom isn't even related to the first two people. He just shares the same last name. So you decided to raid everybody with the last name Wood in Chicago and a lot of people with that last name. Well, what the information was is that one individual indicated that he had heard that maybe Murray was a potential suspect. But the fact, if you look at the threats, it said that me and my boys, plural, so there were other individuals who could be involved. The investigation disclosed that there were three individuals who had some relationship or some association with that residence. Mark Millan had no relationship with that residence. No. He never lived there. He wasn't part of the family. He was actually associated with Murray's residence, which is, I think, a reason against using him as some kind of help. Again, just trying to think of this in the perspective, could a reasonable jury find, are there facts in dispute? Because we can uphold qualified immunity only if, taking all the facts in the light most favorable to the plaintiffs, is it still clear that the officers were in that zone that's protected by the qualified immunity doctrine? And here there are no undisputed facts. Material facts are agreed upon by the parties. You are disputing facts right now. Yeah, and then the timing issue is, to me, a critical thing. This talks about the threat being July 4th, and this raid was June 20th, is that right? The 21st, correct. 21st. So approximately two weeks prior. Right. So in terms of immediacy and imminence, it was not there, was it? We absolutely disagree with that determination because, one, you've got threats of mass murder. No one can deny that that's what this e-mail, these online posts. So the police have investigations. And all I'm saying is, in addition to the other factors that Judge Wood and Judge Posner talked about, in terms of imminence in the two weeks and the prep time, I understand the fear from the e-mail and what had been posted. But just in terms of timing, there was more time to investigate this as well. And then two days later, they just call up Murray and say, hey, would you come down to the station? I mean, it's like it's schizophrenic almost, the facts. So why didn't you use flashbangs with Murray? And I think there's two points. First, the immediacy issue. When the police undertake this investigation, they don't know whether it's going to take one day, five days, 14 days, 30 days, to determine who that person is who made these threats. So the fact that they act immediately is consistent with an ongoing criminal investigation, in part to find a criminal who's made a threat to police, but secondly, who's indicated that he's going to undertake a potential mass murder on July 4th. So if they wait until day 10 and then they find out it takes too long. So no time to stake out the individuals that were revealed when they did that preliminary investigation? They did stake out the home for two hours prior to. Right, two hours. I'm just saying the number of individuals that arose with the same name, the three. Okay. What I mean is no time to like follow them, see them, couldn't have a day to look at them, two days to look at them. I mean, just putting it in context. I mean, is it your position that any anonymous threat of violence against a police officer allows entry into a home like this? Not at all. But the nature of the threat, the gravity of the threat, and the court balances individual intrusion versus government interest. Here you've got a potential mass murder of innocent persons, and you also have police officers who have to go up and serve that warrant. Now, it's easy for us in the confines of a courtroom or our office to say, well, that really wasn't a threat. But when they're walking up that door, they know that there are persons who said... But they're armored. I don't understand that. See, the thing is... They're very heavily protected with their helmets, and they have long rifles, and they have their armor-plated, you know, jackets and so on. And we see it every day. Despite wearing those things, the police officers get shot and killed by people that have these kind of... Where do we see SWAT team members killed every day? That's why I asked you, what is the actual record of attacks on the SWAT team? And there's nothing in the record, but one would think it's irrelevant. Well, you must know something about that, or the police do, right? I would think, you know, there are eight of these guys. I mean, I watched the video. They're very formable. It's difficult to imagine, say, a crook standing up to a SWAT team. Now, maybe it happens. I'm just curious whether this is studied, you know, whether there's any information. Not in the record. But in this case also, the individual would indicate... Well, is it your view that a SWAT team would always be entitled to use flashbangs? Not at all. Where's the line, then? I don't see that. Because if you had investigated for more than two hours, you would have known that none of these people, Anthony Milan Sr., Anthony Milan Jr., Mark Milan, was anywhere near that house. The closest you get is somebody was there four and a half years ago. And you would have seen who was coming in. Actually, you would have seen the girl, the 18-year-old, who looks like she was. She looks very young. She's a young-looking 18. But anyway, be that as it may, they would have seen her. But that's a reason to be cautious with the flashbangs, not to just throw them in the second you walk up to the porch. And I think all those issues relate to what courts say are hindsight. It's not hindsight. It's planning when this extremely dangerous kind of bomb gets thrown into a civilian's house, when you're serving a warrant not for guns, not arrest warrant, a warrant to get an Internet server. And that's correct. But if you look at Escobedo 1, who says, in circumstances where you have a high-risk search warrant, you have persons potentially in the home could cause harm, or you have a safety risk to officers. But do you have those factors here? I'm not sure you mean Escobedo 1 at all. We have all three of those. I'm not sure that's true at all. One, if you look at the threat assessment that the EPD takes before this, under their threat assessment, they do an objective test. They have no information. They have two hours of surveillance on the house. They don't know whose Internet it is. They could have looked up the Internet records, found out that Mrs. Milan was the owner of that, could have tried some more cooperative thing. Would you bring your server in the police station? We think maybe it's been abused. I mean, there's tons of things. I mean, thinking that your option of first choice is to blast in with these two flashbang devices, which can kill people, which can blast their legs off. I mean, it's a troublesome theory. Your idea is when the police are subjectively frightened enough, then it's okay to use it. And I'm not sure that that's the law. We think the law is clear that when there are objective facts indicating a threat to officer safety or a threat to the public interest. I'm trying to focus on those objective facts, too. But you and I seem to have a different list. And I think, one, you've got the anonymous Internet threats, which pose mass murder, which further indicates the risk. But they have to be associated with her house. You can't go blast into every house on the block just because of anonymous Internet threats. That's correct. And when they ran and determined that the anonymous posts had come from the IP address associated with the home. Now, they knew that there was an open wireless connection somewhere in the neighborhood. They couldn't tell whether it was her house or somebody else's. But they could have found that out easily. No. In fact, the EPD says there's no way we could have determined that. And the plaintiffs presented no evidence. Once they had the router, they could have determined it. And that's why they had to go in the house to obtain it. They never asked her. And that was the point. To go up and knock on the door would have potentially subjected them to this risk. Call her on the phone. You know, I mean, it's just to think that you jump all the way up to this level of force is what's terrible. There's no interview of neighbors. No. I mean, to me, it's like fundamentally police work that should have been done, even if it was eight hours to conduct the investigation, two hours. It's just I know that you can't always rely on what people post on the Internet about the timing. And I'll give you that maybe it would be before the 4th of July. But it was just unreasonable to do this. So when you had time to investigate, to run down who these people were, I just don't get it. And I don't see a line. Because to me, it's just the police feel threatened. The person mentions that they're weapons or they're some kind of explosives. And they hate police. And that is a winning formula for using the flashbang. At a particular house. Knowing what you knew from the Internet post, what you knew, tying the Internet post to that house. When they did the investigation, they tied certain individuals who had a criminal history of guns, gang, violent criminal conduct with that house. But the tie is weak. It's just troublesome. Plus the other thing with the explosives and everything. There was a danger then if everything is light, if everybody is so concerned, there was a danger to the neighbors on either side. It doesn't say in here what kind of explosives. And certainly you would get a hold of the neighbors and say, you know, there's going to be a raid here. I mean, you'd ask them some questions. You'd get them out. I mean, if there was that kind of, to me, that kind of fear. And that's the kind of fear you're talking about, right? That the explosives could go off in the house. Well, and the threat that he said he had armor-piercing bullets that could have killed the officers as they entered the residence. So, again, the exigent circumstances factored in with the individuals, raised that level, the gravity of the situation. Why was the girl handcuffed? She looks like a child. She doesn't look like an 18-year-old, at least on the TV. Why would you handcuff a person like that? Because when they were doing a protective sweep of the home, they handcuffed both Ms. Milan and her daughter, took them outside. That's not an answer. That's a mechanical recitation. What is the reason for handcuffing this person? Did they think she was carrying a gun under her skirt or something, or what? As the district court indicated, they were all potential suspects residing in that home. How could the girl be a danger? She could be a suspect, I suppose. Why, how could she be a danger? How could she be a suspect? It'd be great in this day and age if we could believe it anyway. How could she be a suspect? Because she was associated with the home. Did they know she was 18? They could see that she drove a car. Did they know she was 18? They knew she was at least 16 because she drove a car and came back. And the fact that she was in the home made everyone a suspect because of the fact that those threats originated from that IP address associated with the home. And you'd say that if she were 12? You'd say everyone in the home? That's right. 12-year-old? How about a 3-year-old? A 3-year-old might be a little different crawling around, but we don't have a 3-year-old in this case. Why? A 3-year-old is different from a 12-year-old? How is that? Well, because we can see 12-year-olds can shoot a gun. So a 12-year-old is a potential murderer of armed police. I was watching the news last night, and absolutely. Pardon? I said I was watching the news last night, and young kids, absolutely, can be a threat. But again, you go back to what they knew at the time they were going out. I don't think you're very realistic, I must say. You make these SWAT team guys seem so chicken. They're afraid of this girl? No, they were afraid of what was potentially in that home. The girl was in the home, so they handled it. And they didn't know if there was also the person who made these Internet threats and potentially could murder them, who had a hatred for police. My question is why the girl? Because when they went in, the first thing they did was... They thought she was actually a potential murderer? They did a protective sweep of the home, took everyone out. Did they think she was a potential murderer? Anybody in that home was a potential suspect, and they treated... Okay, well, thank you very much. If necessary, I'll give you another minute after Mr. Dukanich, because we asked you a lot of questions. Mr. Dukanich. Good morning, Your Honors, and may it please the Court. Ms. Milan asked that the district court's denial of qualified immunity to the defendants be affirmed so that this matter may proceed to trial. To defeat a qualified immunity defense, a plaintiff must establish that the defendants violated a constitutional right and that that right was clearly established at the time of the alleged violation. Here, Ms. Milan alleges the defendants violated her constitutional right to be free from excessive force. Excessive force claims are analyzed under an objective reasonableness standard. The district court properly found here that the raid on Ms. Milan's home was not objectively reasonable because of the use of flashbang grenades. The first factor to be considered is the severity of the crime. So would you be bringing this case if they hadn't used the flashbangs, if they had just burst into the house with a full SWAT team and arrested everybody? Is this really about what are the standards that a reasonable police officer should know that I've just gone across the line, you know, I can't use these flashbangs? Because obviously we've got to give the police some room for judgment about how much force is necessary. If the flashbang grenades had not been used, I don't believe we'd be bringing the case. In your scenario, you noted that they were arrested there, too. I don't know what would happen after that, but it was the amount of force that was used upon the entry to the home, and it wasn't necessarily the use of the SWAT team either. The Internet threats and postings were grave and worthy of concern, and we're happy the Evansville Police Department promptly investigated them. Let me ask you this. If the threatened date of action wasn't two weeks away, but it was clear from the email that the person was going to act that night, do you think the officer's conduct would be justified, and that would include using the flashbang? No, Your Honor. It would not be justified because we need to focus on what they knew at the time they threw the flashbang grenades. And at that time, even within the two hours of surveillance they did, what they recognized was that Stephanie Milan, the young-looking 18-year-old, came and went from the home, and that was the only person they knew was in the home. Officer Kennedy, during his surveillance, recognized that there were children's bicycles in the driveway. And most importantly, they recognized that Derrick Murray was two houses away, and they admitted during the pre-raid briefing, before they ever threw these flashbang grenades, that he was the individual that they believed to be ultimately responsible. So when we focus on what they actually knew at the time they entered the home, no, it wouldn't be whether it was two weeks or the next day, because at that point they knew that the only person in the home was a very young individual who was not a suspect. And then they also touch upon the three individuals they associate with the home. The three, Anthony, Jr., and Senior, and Mark? Correct. And these three individuals, as Your Honor noted previously, Anthony Milan, Jr. was a registered sex offender, but had not lived there since... Senior was the registered sex. Senior, correct. Had not lived there since June 27, 2008. That's what they knew. There was no record that Anthony Milan, Jr. had ever lived there, and he had several recorded run-ins with the police. And Mark Milan, who did have drug charges or convictions and weapons convictions, was only associated by his last name. And so these three individuals who were not seen at the home during the surveillance period, and were only connected very briefly... Is it correct that the plaintiff was fully compensated for the damage? She was compensated for the door and windows. Pardon? The door and the windows that were broken, correct. Was there other damage to the property other than that? The carpet was burned from where the flashbang grenades occurred. And then there was also non-physical damage when you invite the news crew to the house. Was the carpet replaced or what? I'm not sure if the carpet was replaced. It may have been. What were you saying about the news crews? Stephanie Milan and Louise Milan were filmed by the news and on the news being escorted from their house in handcuffs after the raid, which has a very significant effect on a 68-year-old woman and her 18-year-old adopted daughter when they did nothing wrong here. And given the circumstances when they entered the house and what they knew when they entered the house, I think that has a damaging effect as well. Yeah, there seems to have been naivete about the Internet, actually, failing to put a password on the router. Yes, and they're responsible for not having it secured. But it is not difficult to identify whether a router is secured or not secured. Staying in a hotel, you see a full list of potential connections and it notes which ones are secured, which ones are not secured. And they drove down the street at five miles per hour and right out front of Ms. Milan's home, they recognized there was an unsecured connection. And so that, coupled with Mr. Murray being two houses away, the fact that they had a long history with Mr. Murray and believed that he was ultimately responsible for it, suggests that the force used to go into Ms. Milan's home was not necessary. Now, your opponent argues that we shouldn't take into account the fact that a couple of days later, when they do follow up with Mr. Murray, they basically don't do anything like that. Actually, one of the TV clips on the Eyewitness News video shows them saying, well, we thought there were children around, we didn't think that this degree of force was necessary, and so we just essentially called him up and he came to the station and self-surrendered, if I'm remembering correctly. But they say we shouldn't think of any of that because obviously we need to assess the situation as it faced the officers at the time. Yeah, I think that there's two events there. There's the arrest of Mr. Murray and the execution of a warrant to obtain his electronic devices. And so I think that it's such a perfect example of what could have been done because it was the same exact threats that led up to it. I mean, if we consider what the Evansville Police Department knew at the time they executed the warrant on Mr. Murray's home, they knew at that point that Mr. Murray had actually made the online post at issue threatening to murder the police officers and their families on the 4th of July. They had confirmed that at that point through the Facebook subpoena they got the next day. They knew that Mr. Murray had claimed to have explosives and armor-piercing bullets and weapons. They knew that Mr. Murray had a criminal history of threatening violence to police officers. They knew that Mr. Murray was seen residing at the home and was present in the home when they executed the warrant for the electronic devices. And lastly, they knew that it was closer in time to the threatened action. But at that time they used no SWAT team, no flashbang grenades. They just walked up, knocked, and announced their presence. So you have the exact same set of facts at issue there, and you can see what a reasonable approach would have been. So I don't know what the basis to assume that it's irrelevant. If they want to say it's irrelevant because they thought children were present or it was the same at Ms. Milan's home. Stephanie was present and there was children's bicycles outside. So I don't know the distinction. I think it just sets up a very clear example of what they should have done when they went to Ms. Milan's home. Last, I wanted to address that we believe that Escobedo clearly establishes that guidance for when flashbang grenades should be used and the method with which they should be used. I think we've discussed the severity of the crime at issue and what they knew at the time they went in. But also Escobedo requires that they make sure that there's no innocent individuals around. And here I think the presidents of Stephanie Milan suggested that there was an innocent person in the house. She was not noted as a suspect like Anthony Milan Sr. or Jr. They didn't even associate her with the home. They did not, in the videos, look in to see if there was anybody else at the home. They're also required to carry a fire extinguisher. You mean initially? Because they wandered through the whole house with their flashlights eventually. That was after they threw the flashbang grenades. After they threw the flashbangs. But before they threw it in. Before they threw the flashbangs. Correct. I think in Escobedo they threw it into a darkened room and the individual was blind and deafened as a result. And that's exactly what we want to avoid. They didn't take the time to look in to make sure that nobody was there that could be hit by that flashbang grenade. And then also they are required to carry a fire extinguisher in case there was a fire and they left that back at the SWAT truck. And they had how many people? Obviously the person throwing the flashbangs can't be also carrying the fire extinguisher. But if you've got a team of six or seven people, it doesn't take more than one person to carry it, I assume. One of them could carry it, correct. Or at least they could bring it with them and leave it closer in case something happened. But there was no dispute that they left it back at the SWAT truck, which is two houses away, closer to Derrick Murray. If there are no questions. Okay. I don't think so. Thank you. Thank you, Your Honor. So if you'd like one more summarizing moment, Mr. Burkhart, I will give that to you. Just briefly as to the issues regarding the ultimate arrest of Derrick Murray, what different officers did under different circumstances at a different location at a different time is not relevant to what these officers knew at the time they entered and utilized the force in question. And we think Escobedo 1 recognizes that. Wait. You're saying that these two police activities were not coordinated, even though they were looking for the same person? They were at different locations. They were at Mylan's or at Derrick Murray's mother's house. What is the relevance of the different locations? I thought you were suggesting that it's a different team of police officers and they don't know what the other one is doing. No. What I'm saying is it comes down to you're looking at something that occurred later. Hindsight, which court says you can't consider when you look at qualified immunity, based upon the facts that these particular appellants knew at the day they utilized force. And what I'm saying is the evidence in the record isn't developed because it's not relevant as to what officers went there the next day at Derrick Murray's mother's house, what were the circumstances, who were the people present. There was no threat originating from her mother's house. So I think all those are additional facts that are strictly hindsight that don't come into play to what these officers knew. And so you're saying we can't look at that in terms of the totality of the circumstances, in terms of what the police could have done, what would have been good investigative technique? Because the only thing that was different was this was two days later. Now you have the guy. If anything, you have more information. And that information derived from the fact when they undertook the use of force on Ms. Milan's home, they saw Derrick Murray sitting on a porch two houses down laughing, and the officers then determined that's Derrick Murray's mother's house. And the fact that he was laughing then made him more of a suspect, and they obtained another search warrant. Exactly, exactly, which means that everything is the same. The threat is the same. You know, if everybody's so nervous, you see now he's the guy. He's laughing. That should make you more concerned. He now sees there was an accident, so why not flash bangs there? Why let him come in? Well, one, because the record's not developed on that point because it hasn't to do with what these particular officers did on that day. What additional officers did a day later isn't attributed to these officers. I mean, the courts say that. You look at the information, the reasonable officer, based upon the facts known to these officers at the time of the use of force. Were there two groups of officers that didn't discuss with each other the investigation? There's no evidence in the record of what these officers did. There was a great police department there in DuPage County. Let me ask you, did the police pay to have her— I'm sorry, not DuPage County, Evansville, sorry. Did the police pay for her to replace her carpet? As far as my understanding, the record reflects they paid for everything that she had indicated was damaged, and they also went back the next day and secured her wireless access. Thank you. Thank you. All right, thank you very much. Thanks to both sides. We'll take the case under advisement.